UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

S.F. and Y.D., individually and collectively and
on behalf of G.F.D.,

Plaintiffs

    -against-

**COMPLAINT**
**CASE NO.    11 CV 0870 (DLC)**
**ECF Case**

The New York City Department of Education,

Defendant

-----------------------------------------------------------

    Plaintiffs, S.F. and Y.D., on behalf of G.F.D. by their attorney, Gregory Cangiano, Esq., of the Law Offices of Regina Skyer and Associates, L.L.P. as and for their Complaint, allege and state the following:

1.  Plaintiff, G.F.D. the daughter of plaintiffs S.F. and Y.D., is a minor child who has been classified with a Learning Disability. G.F.D. at all relevant times, was a student residing within the New York City Department of Education School District ("the District") and is entitled to all rights, entitlements, and procedural safeguards mandated by applicable law including, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, the Code of Federal Regulations implementing that statute, found at § 300.342, *et seq.*, Article 89 of the New York State Education Law, and Part 200, *et seq.*, of the Commissioner's Regulations.

2.  Plaintiffs S.F. and Y.D. are residents of the State of New York, residing at all relevant times in Brooklyn, N.Y., within the District.

1

3.  G.F.D. and her parents S.F. and Y.D. are not expressly named herein due to the privacy protections guaranteed by the IDEA, and the Family Educational Rights Privacy Act at 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4.  Defendant School District, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligation to provide G.F.D. with a Free and Appropriate Public Education ("FAPE") in accordance with IDEA mandates.

## JURISDICTION AND VENUE

5.  This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331 and § 1367 has jurisdiction over this action without regard to the amount in controversy. Venue is proper as plaintiff and defendant all reside in or are situated within the District.

## THE RELIEF BEING SOUGHT

6.  This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et seq.*, more commonly known as the IDEA, specifically, 20 U.S.C. § 1415(i)(2)(A), in seeking (a) a modified *de novo* review and reversal of the State Review Officer's (hereinafter "SRO") October 25, 2010 Decision[1] (Appeal No. 10-094) (hereinafter "SRO Decision"); (b) a determination that plaintiffs have met the applicable Second Circuit standard for reimbursement of tuition paid for the unilateral provision of special education services to G.F.D.; (c) an order directing defendant to reimburse plaintiff for the provision of such educational services; and (d) an order granting plaintiff leave to file a fee application pursuant to the fee shifting provisions of the statute.

7.  Plaintiffs seek to secure the reimbursement and declaratory relief denied by the SRO in his decision below.

---

[1] The Decision of the State Review Officer is attached herein as Exhibit A.

8. Pursuant to the IDEA and New York State Education Law, all school districts within the State are required to offer every child with an educationally handicapping condition a FAPE designed to meet the student's individual needs.

9. Defendant School District is a local education agency as defined by 20 U.S.C. § 1401(19), and is obligated to provide G.F.D. with a FAPE.

10. A District may be ordered to reimburse parents for their expenditures for private educational services obtained for a child if the services offered by the District were (1) inappropriate or inadequate; (2) the placement obtained by the parents was appropriate; and (3) equitable considerations support the parents' claim for reimbursement. *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

11. Congress intended that reimbursement should be available to parents as a remedy where the District has failed to comply with its obligation to provide the student with a FAPE. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance." *Burlington*, 471 U.S. at 370-71.

## FACTUAL BACKGROUND

12. During the school year at issue (2009-2010), G.F.D. was a thirteen year old eighth grade student at the Mary McDowell Center for Learning ("MMCL"), a private school that has not been approved by New York State. She has attended MMCL since third grade.

13. A CSE meeting was held on February 24, 2009 to develop an Individualized Education Plan ("IEP") for G.F.D. for the 2009-2010 school year. At that meeting, the team classified G.F.D. as Learning Disabled, and recommended a Special Class in a Community School with a 12:1:1 staffing ratio.

14. The parents maintain that the substantive and procedural inadequacies inherent in the development of G.F.D.'s IEP amount to a denial of FAPE and render that document void.

15. On April 1, 2010, the parents requested a due process hearing, alleging a denial of FAPE by the District for the 2009-2010 academic year. The parents sought a declaration to that effect as well as reimbursement for their unilateral placement of G.F.D. at MMCL.

16. In a hearing lasting four days in April-July of 2010, the Impartial Hearing Officer ("IHO") heard testimony and accepted evidence from both the parents and the District.

17. On August 16, 2010, the IHO rendered a decision properly granting the parents tuition reimbursement in the amount of $41,100.00, and holding that (1) the District had not offered G.F.D. a FAPE for the 2009-2010 school year; (2) the parents had met their burden with respect to the appropriateness of their unilateral placement of G.F.D. at MMCL; and (3) the equities support the parents' claim for tuition reimbursement.

18. The District appealed the IHO's decision to the New York State Education Department's Office of State Review.

19. The State Review Officer's ("SRO") October 25, 2010 decision (No. 10-094) overlooked significant evidence in the record and improperly reversed the IHO's finding of a denial of FAPE, and found that the District had met its burden for the 2009-2010 school year. Having found that the District had offered G.F.D. a FAPE, the SRO did not consider the appropriateness of the parents' unilateral placement at MMCL.

20. The SRO ignored the weight of the testimony and evidence demonstrating that the CSE's recommendations were programmatic and not individualized in nature and that the program would have been unable to provide G.F.D. with a FAPE.

21. The parents' placement of G.F.D. at the MMCL for the 2009-2010 academic year was appropriate as it was individually tailored to offer G.F.D. meaningful educational benefits.

22. The testimony and evidence provided at hearing establish that the equities support the parents' claim for reimbursement. The parents were cooperative and forthcoming with the District by actively participating in the District's evaluation, review and placement process, and providing proper notice of their claim.

## RELIEF SOUGHT

WHEREFORE, it is respectfully requested that the Court:

(a) reverse the October 25, 2010 decision of the SRO (No. 10-094) insofar as it denies relief to the plaintiffs;

(b) declare that defendants failed to offer G.F.D. a FAPE for the 2009-2010 school year; that the parents' unilateral placement of G.F.D. at MMCL was reasonably calculated to confer educational benefits, was reasonable, and is reimbursable under the second prong of the *Burlington/Carter* test for tuition reimbursement; and that the equities favor the parents' claim for tuition reimbursement;

(c) order that defendants reimburse the parents for the cost of tuition at MMCL for the 2009-2010 school year;

(d) declare plaintiffs to be the "substantially prevailing party;"

(e) grant leave to plaintiff's counsel to submit a fee application for the recovery of statutory attorney's fees and other recoverable costs at the administrative level, the SRO level, and in the present action, pursuant to the fee shifting provisions of the IDEA; and

(f)  grant plaintiffs any further relief as may be deemed just under the circumstances.

DATED: February 8, 2011

Submitted by,

Gregory Cangiano, Esq.

Law Offices of Regina Skyer and
Associates, L.L.P.
276 Fifth Avenue, Suite 402
New York, NY 10001
(212) 532-9736



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 10-094

Application of the ███████████████
██████ for review of a determination of a hearing
officer relating to the provision of educational services to a
student with a disability

**Appearances:**

Michael Best, Special Assistant Corporation Counsel, attorney for petitioner, Tracy Siligmueller, Esq., of counsel

Law Offices of Regina Skyer and Associates, attorneys for respondents, Gregory Cangiano, Esq., of counsel

## DECISION

Petitioner (the district) appeals from the decision of an impartial hearing officer which found that it failed to offer an appropriate educational program to respondents' (the parents') daughter and ordered it to reimburse the parents for their daughter's tuition costs at the Mary McDowell Center for Learning (Mary McDowell) for the 2009-10 school year. The appeal must be sustained.

At the time the impartial hearing began, the student was attending Mary McDowell in an eighth grade classroom (Tr. pp. 107, 223). The hearing record reflects that the parents enrolled the student at Mary McDowell when she was in third grade (2004-05), and that she has attended Mary McDowell continuously since that time (Tr. p. 223). Mary McDowell is described in the hearing record as a self-contained school for students with language-based and nonverbal learning disabilities (Tr. pp. 100-01, 102). Mary McDowell has not been approved by the Commissioner of Education as a school with which districts may contract to provide special education services for students with disabilities (see 8 NYCRR 200.1[d], 200.7).

The hearing record reflects that the student is distractible and exhibits weaknesses in executive functioning, written expression, auditory processing, and language processing (Tr. p.

223; Parent Ex. B at p. 7). The student is reported to have deficits in summarizing, paraphrasing, verbal sequencing, auditory memory, language processing, and abstract thinking and is more successful in small groups and 1:1 settings than in a whole group setting (Parent Ex. C at p. 9). The student also has deficits in graphomotor skills and pragmatic language skills (Tr. pp. 35-37; Parent Ex. B at p. 7). The student's eligibility for special education programs and services as a student with a learning disability is not in dispute in this proceeding (see 34 C.F.R. § 300.8[c][10]; 8 NYCRR 200.1[zz ][6]).

On February 6, 2009, the parents executed an enrollment contract for the student to attend Mary McDowell for the 2009-10 school year when she would be in the eighth grade (Tr. p. 243; Parent Ex. H at pp. 1, 2). Pursuant to the terms of the contract, the parents agreed to pay $20,760 of the full tuition by July 1, 2009 and the balance of the tuition, fees, and charges by December 1, 2009 (Parent Ex. H at p. 1). The hearing record reflects that the parents made tuition payments to Mary McDowell on July 1, 2009, September 3, 2009, and January 5, 2010 (Parent Ex. G at p. 1).

On February 24, 2009, the district's Committee on Special Education (CSE) met for an annual review of the student's program (Parent Ex. B at pp. 1, 2). The meeting attendees included the district representative who also functioned as the school psychologist, one of the student's special education teachers from Mary McDowell who participated by telephone for part of the meeting, the parents, an additional parent member, and a regular education teacher (Tr. pp. 25, 233-34, 237, 239-40; Parent Ex. B at p. 2). The February 2009 CSE continued to find the student eligible for special education services as a student with a learning disability and recommended a 10-month 12:1+1 special class in a community school with related services of three 30-minute speech-language therapy sessions in a group of three, one 30-minute individual occupational therapy (OT) session, and one 30-minute counseling session in a group of three (Tr. pp. 35, 38, 238; see Parent Ex. B at p. 13). The resulting February 2009 individualized education program (IEP) contained annual goals in the areas of reading (decoding and comprehension), writing, math (computation and word problems), speech and language (auditory processing skills and pragmatic language skills), graphomotor skills, and counseling (Parent Ex. B at p. 6-7). The February 2009 CSE also considered a collaborative team teaching[1] program as well as a 12:1 special class in a community school (Tr. p. 38; Parent Ex. B at p. 12), but thought at the time that the 12:1+1 program "was the best program" for the student (Tr. pp. 38-39). The parents did not advise the February 2009 CSE that they had previously executed a contract for the student to attend Mary McDowell for the 2009-10 school year (Tr. pp. 242-43).

On April 16, 2009, the district mailed the February 2009 IEP to the parents (Parent Ex. B at p. 2; see Tr. pp. 237, 240-41). The hearing record reflects that the parents did not submit any objections to the district when they received the February 2009 IEP and that they "pass[ed] it on" to their attorneys (Tr. p. 241).

In an end of the year report dated spring 2009, the student's teachers at Mary McDowell summarized the student's progress and participation during the third trimester in her seventh

---

[1] "Collaborative team teaching," also referred to in State regulation as "integrated co-teaching services," means "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students" (8 NYCRR 200.6[g]).

grade classroom at that school (Parent Ex. C at pp. 1-11). The report reflected, among other things, that the student had received grades ranging from 90 to 97 in academic subjects and had received a rating of "independently mastered" for all items regarding organizational, behavioral, and social interactions (id. at pp. 3-8). The student's performance on the spring 2009 administration of the Gates-MacGinitie Reading Tests-Fourth Edition Level 6 Form "S" yielded percentile ranks in the average range in vocabulary (54), comprehension (37), and in her total reading score (45) (id. at p. 11). With regard to math, the student's performance on the Iowa Tests of Basic Skills Mathematics, Level 12 Form "K" yielded percentile ranks in the average range in problem solving and data interpretation (42), the low average range in computation (23) and total score (19), and in the low range in concepts and estimation (5) (id.). The report also reflected that the student had received speech and language therapy once per week for 40 minutes in a group of three as well as push-in sessions during whole group academic classes (id. at p. 9).

By letter dated August 13, 2009, the district notified the parents of the specific location of the student's proposed program and summarized the recommendations made by the February 2009 CSE (Dist. Ex. 1). The hearing record reflects that the parents were away on vacation in the latter part of August 2009 and received the district's letter when they returned home in early September 2009 (Tr. pp. 250-51, 270, 280-81).

By letter dated August 24, 2009, the parents, through their attorney, advised the district that they were placing the student at Mary McDowell "as of the first day of school for academic year 2009-10" and that they would seek tuition reimbursement from the district (Parent Ex. 1). Among other things, the parents asserted that as of the date of their letter, the student "has not been offered a specific placement" (id.).[2] The parents also contended that the February 2009 IEP was defective as a result of an improperly composed review team, inadequate evaluations and goals, and "the faulty policy and practice of lowering promotional criteria" (id.). The parents advised the district that once they received a placement notice and had an opportunity "to view and assess the appropriateness" of the placement, they would "either place the child accordingly or file a detailed hearing request" (id.). The parents stated that they were placing the student at Mary McDowell "[i]n order to assure" that the student "has a school program to attend that is reasonably calculated to confer benefits to her" (id.).

The student's mother visited the district's recommended school in early December 2009, toured the school, and met with the special education coordinator (Tr. pp. 271-73). The district was unable to accommodate the mother's request to visit the recommended classroom (Tr. pp. 272-73). After visiting the recommended school, the student's mother returned the district's August 13, 2009 notice to advise the district that she found the recommended school inappropriate (Tr. p. 279).

By due process complaint notice dated January 7, 2010, the parents, through their attorney, requested an impartial hearing (Parent Ex. A). They alleged that the district had failed to offer the student a free appropriate public education (FAPE) on procedural and substantive grounds and had denied the parents a meaningful opportunity to develop an IEP (id. at pp. 1, 3).

---

[2] Presumably, the parents' attorney was not aware of the district's August 13, 2009 letter in light of the fact that the parents were away on vacation until September 2009 (Tr. pp. 250-51, 270, 280-81).

The parents advised the district that because of its failure to offer the student a FAPE, they had unilaterally placed the student at Mary McDowell and were seeking tuition reimbursement for the student's placement at that school (id. at p. 1). The parents further indicated that they had provided the district with notice of their intent to place the student at Mary McDowell by their attorney's August 24, 2009 letter (id.).

Specifically, the parents contended that despite a February 2009 CSE review, they were not sent a final notice of placement "until the middle of August 2009" (Parent Ex. A at pp. 1-2). The parents further asserted that the student's mother was not provided an opportunity to visit the recommended classroom in December 2009 even though she had explained to school personnel during her visit to the recommended school that it was important for her to observe the classroom and that "this would be a major decision for her" (id. at p. 2). Among other things, the parents also challenged the composition of the February 2009 CSE and the use of "subjective teacher assessments" as well as the annual goals and short-term objectives in the February 2009 IEP (id. at pp. 2-3). The parents asserted that the recommended classroom did not provide the student "with a suitable and appropriate peer group for instructional or social/emotional purposes" (id.). The parents further asserted that the instructional methodologies used in the proposed classroom were "not in line" with what was recommended in the February 2009 IEP; that the environment of the recommended school would be distracting to the student because of its size and because it was housed with two other schools; and that there was no indication that anyone at the proposed school used FM units, which the student required (id. at pp. 2, 3).

The impartial hearing began on April 13, 2010 and concluded on July 1, 2010, after four days of proceedings (Tr. pp. 1, 15, 166, 215). By decision dated August 16, 2010, the impartial hearing officer concluded that the district failed to offer the student a FAPE on both procedural and substantive grounds (IHO Decision at pp. 13, 14). With respect to the timeliness of the district's offer of placement, the impartial hearing officer concluded that the district's February 2009 IEP "was issued early enough for the [district] to make a placement recommendation in a timely manner," that the district "chose inexplicably to make a placement recommendation in mid-August 2009," and that the district should have made "a timely placement offer that could be visited and evaluated by the parents prior to the beginning of the school year" (id. at p. 11). According to the impartial hearing officer, the parents "understandably chose" to continue the student's enrollment at Mary McDowell since they were unable to visit the proposed classroom in August 2009 (id.). The impartial hearing officer concluded that although the student's mother visited the recommended placement in December 2009 and found it unacceptable, she was not permitted to visit the classroom and therefore could not "judge whether the class was suitable for her child" (id.). With respect to the composition of the proposed classroom, the impartial hearing officer determined that the district did not meet its burden to show that the "grouping" of the student with other students was appropriate (id. at pp. 11-12). The impartial hearing officer also found that the district did not show how the proposed school would meet the student's needs that were identified by the parents during the impartial hearing, including the student's distractibility, need for "very close teacher-pupil interaction on a step by step basis," and need for a quiet environment (id. at p. 12).

The impartial hearing officer found that the parents met their burden to show that the student's unilateral placement was appropriate (IHO Decision at pp. 12-13). According to the

impartial hearing officer, the parents' witnesses all knew the student well and testified that the student needed the small structured environment at Mary McDowell to function successfully (id. at p. 13). With respect to the district's contention that Mary McDowell did not provide the student with the related services that she requires, the impartial hearing officer referred to testimony indicating that the student made progress without OT or counseling and that she received "push in" speech therapy at Mary McDonnell during history and science (id.). With respect to equitable considerations, the impartial hearing officer concluded that the parents "fully cooperated" with the district "in good faith at all times" and that the parents attended the February 2009 CSE meeting and visited the district's recommended placement (id.). He also concluded that since the district's recommended school was "clearly inadequate," it was "sufficient … that the parents visited the site before rejecting it" and that it would be speculative and irrelevant to determine whether the parents would have actually withdrawn the student from Mary McDowell had the district's school been appropriate (id.). Accordingly, the impartial hearing officer determined that equities weighed in the parents' favor and awarded the parents tuition reimbursement for the student's enrollment at Mary McDowell for the 2009-10 school year (id.).

The district appeals, contending that it offered the student a FAPE for the 2009-10 school year and requesting that the impartial hearing officer's decision be vacated in its entirety. In particular, the district asserts that the impartial hearing officer erred by determining that the district's August 13, 2009 placement notice was not timely because the parent could not visit the school prior to the start of the school year and was unable to visit the proposed classroom in December 2009. The district asserts that its August 13, 2009 notice was timely, did not cause a denial of a FAPE, and that the parents "have no legal right to visit a recommended placement, and, therefore, any alleged inability to do so cannot cause a deprivation of FAPE" (Pet. ¶ 46). With respect to the grouping of the student with other students and the composition of the proposed classroom, the district contends that the hearing record shows that the student fell within "the range of the academic levels of the other students in the recommended class" (id. ¶ 53). The district asserts that the student would "get along" with her peers, that a lot of the students in the proposed classroom were socially "on par" with the student, that the behavior of the students could be addressed by the special education classroom teacher, and the fact that two students in the classroom had different classifications than the student did not render the proposed classroom inappropriate (id.). In addition, the district alleges that the impartial hearing officer erred in concluding that the recommended school was inappropriate. Furthermore, to support its contention that it offered the student a FAPE for the 2009-10 school year, the district addresses, in its petition, issues that were raised in the parents' due process complaint notice that were not addressed by the impartial hearing officer.

Regarding the parents' unilateral placement of the student, the district alleges that Mary McDowell is not appropriate because it does not provide the type and amount of speech-language therapy that the student requires to receive educational benefits. The district also alleges that equitable considerations do not favor an award of tuition reimbursement to the parents. In particular, the district alleges that tuition reimbursement is precluded because the parents signed an enrollment contract with Mary McDonnell before the February 2009 CSE meeting but did not advise the CSE of the contract. The district also asserts that the parents had no legal right to visit the recommended school, that the parents did not respond to the district's

August 2009 placement notice, and that the parents' December 2009 visit to the recommended school was "arguably" in preparation for the impartial hearing and not because they wished to genuinely consider that placement (id. ¶ 58).

The parents answered the district's petition, contending that the impartial hearing officer's decision should be upheld. With respect to the proposed classroom, the parents allege that the recommended classroom would not contain a suitable and functional peer group for instructional and social-emotional purposes. The parents further allege that the district failed to establish how the instruction in the recommended classroom would be differentiated to meet the student's "unique educational needs" (Answer ¶¶ 24, 33). The parents also responded to those issues asserted by the district in its petition that were not discussed by the impartial hearing officer.

Two purposes of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; A.H. v. Dep't of Educ., 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be

thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008]), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Subsequent to its development, an IEP must be properly implemented (8 NYCRR 200.4[e][7]; Application of a Child with a Disability, Appeal No. 08-087).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148). The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

I will now turn to the merits of the appeal.  I will first address the district's contention that the impartial hearing officer erred in finding that the district did not timely notify the parents of the specific location of the student's proposed program.  The IDEA requires a district to have an IEP in effect for each student with a disability at the beginning of each school year (20 U.S.C. § 1414[d][2][a]; 34 C.F.R. § 300.323[a]; 8 NYCRR 200.4[e][1][ii]).  A district's delay in recommending a placement "does not violate the IDEA so long as [the district] still has time to find an appropriate placement for the beginning of the school year in September" (M.P.G., 2010 WL 3398256, at \*9-\*10; Tarlowe, 2008 WL 2736027, at \*6, quoting Bettinger v. New York City Bd. of Educ., 2007 WL 4208560, at \*8 n.26 [S.D.N.Y. Nov. 20, 2007]; see Application of the Dep't of Educ., Appeal No. 09-001 [district failed to offer a FAPE where it failed to make any formal placement offer for the student]; Application of a Student with a Disability, Appeal No. 08-088 [district failed to offer a FAPE where its notice of placement did not offer the recommended placement at a school where the student's IEP could be implemented at the beginning of the school year]).

In this case, there is no dispute that the February 2009 CSE met to develop an IEP for the student for the 10-month school year beginning in September 2009 (see Parent Ex. B at p. 2).  The district's August 13, 2009 notice offering a public school placement provided the parents with sufficient notice to visit the proposed school and to enroll the student prior to the first day of classes in the 2009-10 school year, which commenced "shortly after" Labor Day in September 2009 (Tr. pp. 265-66; Parent Ex. B at p. 2).  Additionally, there is no evidence in the hearing record that the receipt of the August 13, 2009 notice impeded the student's right to a FAPE, significantly impeded the parents' meaningful participation in the CSE process, or caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; see M.P.G., 2010 WL 3398256, at \*9-\*10; Tarlowe, 2008 WL 2736027, at \*6).  Therefore, the impartial hearing officer erred in determining that the district's August 13, 2009 notice was not timely (see M.P.G., 2010 WL 3398256, at \*9-\*10; Tarlowe, 2008 WL 2736027, at \*6).

I also agree with the district that the impartial hearing officer erred when he concluded that the district had an obligation to provide the parents with an opportunity to visit the recommended school and classroom.  In general, the IDEA requires parental participation in determining the educational placement of a student (see 34 C.F.R. §§ 300.116, 300.327, 300.501[c]).[3]  However, the assignment of a particular school may be an administrative decision, provided that it is made in conformance with the CSE's educational placement recommendation (Letter to Veasey, 37 IDELR 10 [OSEP 2001]).  The U.S. Department of Education's Office of Special Educational Programs (OPSEP) has opined that the IDEA does not provide a general

---

[3] The Second Circuit has established that "'educational placement' refers to the general educational program -- such as the classes, individualized attention and additional services a child will receive – rather than the 'bricks and mortar' of the specific school" (T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419-20, cert. denied, 130 S. Ct. 3277 [2010]; see K.L.A. v. Windham Southeast Supervisory Union, 2010 WL 1193082, at \*2 [2d Cir. March 30, 2010]; Concerned Parents & Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751, 756 [2d Cir. 1980]).  While statutory and regulatory provisions require an IEP to include the "location" of the recommended special education services (20 U.S.C. § 1414[d][1][A][i][VII], 34 C.F.R. § 320[a][7], 8 NYCRR 200.4[d][2][v][b][7]), it does not follow that an IEP must identify a specific school site (T.Y., 584 F.3d at 419-20).

entitlement to parents of students with disabilities to observe their children in any current classroom or proposed educational placement (Letter to Mamas, 42 IDELR 10 [OSEP 2004]; see Application of a Student with a Disability, Appeal No. 09-082; Application of the Dep't of Educ., Appeal No. 08-097; Application of a Child with a Disability, Appeal No. 07-049; Application of a Child with a Disability, Appeal No. 07-013).

It is undisputed that the parents did not have the opportunity to visit the district's recommended school before the beginning of the school year in September 2009 and that the student's mother was not permitted to visit the proposed classroom when she visited the district's school in December 2009 (Tr. pp. 266, 272-73). In this case, the parents make no claim that the student's special education and related services needs could only be met in a particular classroom or school. Moreover, a review of the hearing record reveals no evidence to support a claim that the student's special education and related services needs could only be met in a particular classroom or school. Upon review, I find that as a result of the February 2009 CSE meeting, the district offered the student services along the continuum of services, in particular a 12:1+1 special class with an FM unit, OT, counseling, and speech-language therapy (see 8 NYCRR 200.4[d][2][v], 200.6[e], [h]). The hearing record also demonstrates that the parents had an opportunity to participate in the development of the February 2009 IEP. The student's father testified that the parents were "open" to the recommendation of a 12:1+1 program and that he understood that "it was one of the better recommendations" for the student (Tr. pp. 238-39, 247, 249). Moreover, the parents did not voice any objections at the February 2009 CSE meeting regarding the 12:1+1 program (Tr. pp. 239, 250). Further, while the parents testified that they forwarded a copy of the February 2009 IEP to their attorney, the hearing record reflects that their attorney did not submit any concerns about the IEP prior to his August 24, 2009 letter. Based on the above, I find that the lack of an opportunity for the parents to visit the proposed school prior to the start of the 2009-10 school year and their inability to visit the proposed classroom did not (1) impede the student's right to a FAPE, (2) significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (3) cause a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]). Thus, the impartial hearing officer erred in determining that the parent's inability to observe the particular classroom identified in the district's August 13, 2009 letter rose to the level of a denial of a FAPE (Application of the Dep't of Educ., Appeal No. 08-097).

Next, I will address the parties' dispute about whether the student would have been appropriately grouped for instructional purposes in the proposed classroom. State regulations require that in special classes, students must be suitably grouped for instructional purposes with other students having similar individual needs (8 NYCRR 200.1[ww][3][i], 200.6[a][3], [h][3]; see Walczak, 142 F.3d at 133 [approving an IEP that placed a student in a classroom with students of different intellectual, social, and behavioral needs, where sufficient similarities existed]; Application of a Student with a Disability, Appeal No. 09-082; Application of the Dep't of Educ., Appeal No. 08-095; Application of the Dep't of Educ., Appeal No. 08-018; Application of a Child with a Disability, Appeal No. 07-068; Application of a Child with a Disability, Appeal No. 05-102). State regulations further provide that determinations regarding the size and composition of a special class shall be based on the similarity of the individual needs of the students according to: levels of academic or educational achievement and learning

9

characteristics; levels of social development; levels of physical development; and the management needs of the students in the classroom (8 NYCRR 200.6[h][2]; see 8 NYCRR 200.1[ww][3][i][a] – [d]).  The social and physical levels of development of the individual students shall be considered to ensure beneficial growth to each student, although neither should be a sole basis for determining placement (8 NYCRR 200.6[a][3][ii], [iii]).   Further, the management needs of students may vary and the modifications, adaptations and other resources are to be provided to students so that they do not detract from the opportunities of the other students in the class (8 NYCRR 200.6[a][3][iv]).  The similarity of abilities and needs may be demonstrated through the use of a proposed class profile or by the testimony of a witness who is familiar with the children in the proposed class (Application of the Dep't of Educ., Appeal No. 08-095; Application of the Dep't of Educ., Appeal No. 08-018; Application of a Child with a Disability, Appeal No. 07-068).  State regulations also require that a "district operating a special class wherein the range of achievement levels in reading and mathematics exceeds three years shall, . . . , provide the [CSE] and the parents and teacher of students in such class a description of the range of achievement in reading and mathematics, . . . , in the class, by November 1st of each year" (8 NYCRR 200.6[g][7]).  However, the regulations do not preclude a grouping of students in a classroom when the range of achievement levels in reading and math would exceed three years (see Application of the Dep't of Educ., Appeal No. 08-018; Application of the Bd. Of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 01-073).

Upon careful review, I find that the hearing record shows that the student would have been suitably grouped for instructional purposes in the district's proposed 12:1+1 classroom.  According to the hearing record, the student's recommended eighth grade 12:1+1 classroom would have been comprised of ten students; eight students were classified as learning disabled, one student was classified as other health impaired, and one student was classified as emotionally disturbed (Tr. pp. 85, 87-88).  The classroom teacher has a master's degree in special education, was certified to teach special education, and had been teaching at the recommended school for the past four years (Tr. pp. 54-55).  The classroom included one paraprofessional assigned to the classroom and an additional health paraprofessional who was assigned to a specific student (Tr. p. 88).  The classroom paraprofessional has a master's degree in economics and five years experience working in the school (Tr. pp. 58-59).  The additional paraprofessional has a bachelor's degree in education and 10-11 years experience (Tr. p. 59).  The hearing record reflects that the role of the paraprofessionals is to provide academic assistance or social-emotional support to the students and is further defined by the teacher and what is necessary in the classroom on a given day (Tr. p. 60).  The paraprofessionals assisted in small groups, with individual students, and also moved around the room as needed (id.).

The special needs coordinator at the district's recommended school testified that the academic functional levels in the recommended classroom ranged from third to seventh grade (Tr. pp. 63, 65, 91-93).  She indicated that differentiation strategies were utilized in the recommended program because "[o]ne size doesn't always fit all" (Tr. p. 66).  The special needs coordinator indicated that instruction is differentiated by content, by product, and by process and that a student may require one or all of these types of differentiation of instruction (id.).  The special needs coordinator further testified that she meets weekly with her teachers, the math coach, and the assistant principal to discuss students, to look at students' work, and to see what can be done to move them closer toward grade level (Tr. p. 67).  Teachers also craft classroom

activities and homework assignments based on where the students are in terms of interest and level in order to meet the students at their level and move them up (id.). The hearing record further indicated that the student would be provided with graphic organizers as well as other visual aids in the proposed classroom and that the students in the proposed classroom participate in pre-writing activities, such as brainstorming (Tr. p. 32).

Testimony by the special needs coordinator also indicated that the student's IEP was similar to that of some of the other students in the recommended class (Tr. pp. 83-84). She further indicated that the proposed school could provide the services set forth on the student's IEP, including speech-language therapy, OT, counseling, and an FM unit (id.). Additionally, she testified that the school is familiar with FM units, as the school has students who use FM units (Tr. p. 83). The hearing record also reflects that the academic functional levels reflected in the student's February 24, 2009 IEP, which were provided by the student's then-current teacher at Mary McDowell, indicated that the student's academic functioning ranged from the fourth grade level to the mid sixth grade level (Tr. p. 27; Parent Ex. B at p. 3). Testimony by the special needs coordinator indicated that the student's functional level would fall in the middle of the range of functioning of the recommended classroom in decoding, reading comprehension, writing, computation, problem solving, and spelling (Tr. pp. 63, 64, 65, 67, 69). She further stated that like the student, problem solving is an area wherein many of the students in the recommended classroom need a lot of remediation (Tr. p. 68). The special needs coordinator also testified that the student's need for multisensory reading instruction would have been addressed in the recommended classroom using the Wilson reading program as well as by using graphic organizers and manipulatives (Tr. p. 71).

With regard to social/emotional functioning, the hearing record reflects that the student's teacher reported that the student had been having a "great" year socially; had made some new friends; was respectful toward adults; was compliant with school rules; and had been involved in extra curricular activities including sports, music lessons, and dance (Tr. p. 29; Parent Ex. B at p. 4). The special needs coordinator testified that socially, the student "would definitely [get] along with her peers" and that many of the students in the recommended classroom were "on par" with the student (Tr. p. 70). The special needs coordinator further explained that the student's February 2009 IEP reflected that the student's behavior did not seriously interfere with instruction and could be addressed by the special education classroom teacher, which was similar to the social/emotional needs of the students in the proposed classroom (id.; see Parent Ex. B at p. 4).

Based on the foregoing, I find that the student would have been suitably grouped for instructional purposes in the proposed eighth grade classroom at the district's recommended school.

Lastly, I will turn to the district's contention that the impartial hearing officer erred in concluding that the district did not meet its burden to show that the recommended school was appropriate (IHO Decision at p. 12). With regard to the student's need for a non-disruptive academic environment, the special needs coordinator testified that the behaviors that occur in the recommended classroom included calling out of turn, getting up without asking, and walking out of the room without permission (Tr. p. 96). She further testified that she did not have "anyone

11

throwing desks or chairs" and that she did not believe that if someone left the room it would prevent the student from getting an appropriate education (Tr. p. 97). The special needs coordinator also testified that the additional adult support in the recommended classroom is available to address or redirect a student who, for example, may have left the classroom without permission in order to go to the bathroom (see id.). In addition, the district regular education teacher who participated in the February 2009 CSE meeting testified that the student "qualified to receive her own personal FM unit that would...screen out the extraneous noise and help her focus better" (Tr. p. 29). The hearing record therefore reflects that the student's distractibility and her need for close teacher-pupil interaction would have been appropriately addressed in the district's recommended 12:1 +1 classroom, which included a special education teacher and a paraprofessional. With respect to the parents' contention that the recommended school was not an appropriate setting because the school was within a building that contained multiple schools, the hearing record indicates that the student's academic classes were on the second and fourth floor and the other school was located on the first floor (Tr. pp. 57-58, 86). I find that the hearing record does not support the parents' claim that the setting and/or location of the school building would preclude the recommended school from providing the student with a FAPE. Accordingly, I find that the impartial hearing officer erred in concluding that the district did not demonstrate how its proposed school would meet the student's needs.

In conclusion, upon review and due consideration of the entire hearing record in this matter and for the reasons set forth above, I find that the impartial hearing officer erred in determining that the district did not offer the student a FAPE for the 2009-10 school year. Having reached this determination, it is not necessary to reach the issue of whether Mary McDowell is an appropriate placement for the student and the necessary inquiry is at an end (see M.C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; Application of a Student with Disability, Appeal No. 08-158; Application of a Child with a Disability, Appeal No. 05-038).

I have considered the parties' remaining contentions and find that I need not address them in light of my determinations.

**THE APPEAL IS SUSTAINED.**

**IT IS ORDERED,** that the impartial hearing officer's decision dated August 16, 2010 is annulled in its entirety.

Dated:     **Albany, New York**
           **October 25, 2010**

                              **ROBERT G. BENTLEY**
                              **STATE REVIEW OFFICER**

12