UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
S.F. and Y.D., individually and           :
collectively and on behalf of G.F.D.,     :
                                          :
                Plaintiffs,               :    11 Civ. 870 (DLC)
                                          :
        -v-                               :    OPINION AND ORDER
                                          :
THE NEW YORK CITY DEPARTMENT OF           :
EDUCATION,                                :
                Defendant.                :
                                          :
------------------------------------------X

APPEARANCES:

For plaintiffs:
Gregory Cangiano
Skyer, Castro, Foley & Gersten
276 5th Avenue, Suite 402
New York, New York 10001

For defendant:
Mark Galen Toews
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007


DENISE COTE, District Judge:

        Plaintiffs S.F. and Y.D., on behalf of their minor child

G.F.D. (the "Student"), bring this action pursuant to the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400

et seq. (the "IDEA").[1]  Plaintiffs seek review of the October 25,

---

[1]     Congress amended the IDEA by enacting the Individuals with
Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub.
L. No. 108-446, 118 Stat. 2647, which took effect on July 1,

2010 administrative decision of State Review Officer Robert G.
Bentley (the "SRO") annulling the August 16, 2010 decision of
Impartial Hearing Officer Martin Schiff, Esq. (the "IHO") and
vacating the IHO's award of tuition payment and reimbursement
for the Student's attendance at a private school during the
2009-2010 school year (the "SRO Decision").   Plaintiffs moved
for summary judgment on May 31, 2011, seeking an order reversing
the SRO Decision and reinstating the IHO's award of tuition
payment and reimbursement.   The defendant, The New York City
Department of Education ("DOE"), cross-moved for summary
judgment on July 1, seeking an order upholding the SRO Decision
and dismissing the plaintiffs' complaint.   For the reasons set
forth below, the DOE's motion for summary judgment is granted
and the plaintiffs' motion for summary judgment is denied.


STATUTORY BACKGROUND

        Congress enacted the IDEA "to ensure that all children with
disabilities have available to them a free appropriate public
education that emphasizes special education and related services
designed to meet their unique needs . . . [and] to ensure that
the rights of children with disabilities and parents of such

_____

2005.  Courts, however, continue to refer to the amended Act as
the IDEA.  Except where noted, the statutory citations in this
Opinion are to the IDEA as amended by the IDEIA.

children are protected."  20 U.S.C. § 1400(d)(1)(A) & (B); <u>see
also</u> <u>Forest Grove Sch. Dist. v. T.A.</u>, 129 S. Ct. 2484, 2491-92
(2009) (discussing the purposes of the IDEA); <u>Winkelman ex rel.
Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 523 (2007)
(same).  States receiving federal funding under the IDEA are
required to make a free appropriate public education ("FAPE")
available to all children with disabilities residing in the
state.  20 U.S.C. § 1412(a)(1)(A).  To this end, the IDEA
requires that public schools create for each student covered by
the Act an individualized education program ("IEP") for the
student's education at least annually.  20 U.S.C.
§ 1414(d)(2)(A); <u>see also</u> <u>Honig v. Doe</u>, 484 U.S. 305, 311 (1988)
("[T]he IEP sets out the child's present educational
performance, establishes annual and short-term objectives for
improvements in that performance, and describes the specially
designed instruction and services that will enable the child to
meet those objectives."); <u>D.D. ex rel. V.D. v. N.Y. City Bd. of
Educ.</u>, 465 F.3d 503, 507 (2d Cir. 2006) (describing the IEP as
"[t]he centerpiece of the IDEA's educational delivery system"
(citation omitted)).

In New York City, the DOE is charged with providing a FAPE
to all students with disabilities between the ages of 3 and 21
who reside in the City, and to develop the IEP for these
students by convening local Committees on Special Education

("CSEs").  N.Y. Educ. L. § 4402.  "In developing a particular
child's IEP, a CSE is required to consider four factors: (1)
academic achievement and learning characteristics, (2) social
development, (3) physical development, and (4) managerial or
behavioral needs."  Gagliardo v. Arlington Cent. Sch. Dist., 489
F.3d 105, 107-08 (2d Cir. 2007).  The IEP must provide "special
education and related services tailored to meet the unique needs
of a particular child, and be reasonably calculated to enable
the child to receive educational benefits."  Id. at 107
(citation omitted).  "A school district fulfills its substantive
obligations under the IDEA if it provides an IEP that is likely
to produce progress, not regression, and if the IEP affords the
student with an opportunity greater than mere trivial
advancement."  T.P. ex rel. S.P. v. Mamaroneck Union Free Sch.
Dist., 554 F.3d 247, 254 (2d Cir. 2009) (citation omitted).

     The IDEA requires that parents be provided an opportunity
to present a complaint with respect to the identification,
evaluation, or placement of their child through the IEP process.
20 U.S.C. § 1415(b)(6)(A).  Where the parents believe that the
school district has not adequately responded to their
complaints, the IDEA requires that they be given an opportunity
to pursue their grievances through an "impartial due process
hearing."  Id. § 1415(f)(1)(A).  In New York, these hearings are
conducted by an IHO, and parties aggrieved by the IHO's decision

may appeal to the SRO.  See N.Y. Educ. L. § 4404; 20 U.S.C.
§ 1415(g)(1) (permitting "any party aggrieved by the findings
and decision rendered [by the hearing officer] [to] appeal such
findings and decision to the State educational agency").  The
IDEA further provides that the final administrative decision may
be reviewed "in a district court of the United States" by
"bring[ing] a civil action with respect to the complaint."  20
U.S.C. § 1415(i)(2)(A).  The district court is empowered to
"receive the records of the administrative proceedings," to
"hear additional evidence," and to "grant such relief as the
court determines is appropriate" based on "the preponderance of
the evidence" before it. Id. § 1415(i)(2)(C); see also Forest
Grove, 129 S. Ct. at 2492 (noting that the IDEA "gives courts
broad authority to grant 'appropriate' relief").  The IDEA
specifically contemplates that "when a public school fails to
provide a FAPE and a child's parents place the child in an
appropriate private school without the school district's
consent, a court may require the district to reimburse the
parents for the cost of the private education."  Forest Grove,
129 S. Ct. at 2488; see 20 U.S.C. § 1412(a)(10)(C).


FACTUAL BACKGROUND

     The following facts are taken from the parties' Local Rule
56.1 statements, as supported by the administrative record, and

5

are undisputed unless otherwise indicated.[2]

I.   The Plaintiffs

Plaintiffs S.F. and Y.D. (collectively, the "Parents") are the mother and father, respectively, of the Student.  The Student was born on August 14, 1996.  The Student attended public school for kindergarten, first and second grade.  Since the third grade, and including the 2009-2010 school year which is at issue in this case, the Student has attended the Mary McDowell Center for Learning, a private school that has since changed its name to Mary McDowell Friends School ("MMFS").

During the 2009-10 school year, the Student was a thirteen-year-old in eighth grade at MMFS.  The Student is classified as a "child with a disability" as that term is defined under the IDEA.

II.  The CSE Meeting and the Student's IEP

On February 24, 2009, a CSE was convened to create an IEP for the Student for the 2009-2010 school year.  The CSE consisted of Ann Parise ("Parise"), as the general education teacher; the Parents; Shirley Piccola, a school psychologist; a

---

[2]   Local Rule 56.1 requires that any motion for summary judgment be accompanied by a list of the "material facts as to which the moving party contends there is no genuine issue to be tried."  S.D.N.Y. L. Civ. R. 56.1(a).  In IDEA cases, however, Rule 56.1 statements are not strictly required; "while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive."  T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

parent member; and Soo Feingold ("Feingold"), the Student's homeroom teacher at MMFS, as the special education teacher. Parise, although certified as a general education teacher, has not taught in a general education classroom since the late 1980s. Feingold participated in the CSE meeting by telephone for approximately twenty minutes, after which, Y.D. testified, she asked if the CSE needed anything further from her and was told that they did not. She then hung up the telephone.

At the meeting, the CSE considered placing the Student in a Collaborative Team Teaching ("CTT") class,[3] but rejected that possibility because the Student might feel overwhelmed in such a large class. The CSE also considered a class environment with a 12:1 or 12:1:1 ratio of students to teachers. The 12:1:1 classroom includes one teacher and one paraprofessional in a class of no more than twelve students. The input of Feingold and the Parents, led the team to conclude that a 12:1:1 classroom would be more beneficial, as the Student would benefit from the presence of the additional adult in the classroom, someone who could provide prompts, redirection, check-ins, and additional support throughout the day.

As the CSE meeting was an annual review, no new testing was

---

[3]    Collaborative Team Teaching involves teaching a class that includes both students who are learning disabled and those who are not.  8 N.Y.C.R.R. 200.6(g).  These classes are co-taught by a general education and special education teacher.

conducted.   The team did review a teacher report from the Student's teachers at MMFS ("MMFS Report"), which includes, inter alia, a narrative description of the Student's academic progress in the classroom, tabular evaluations of her academic and social-emotional functional levels, and standardized test results in reading and mathematics.   The MMFS Report included a lengthy narrative about the Student's academic and social progress in each of her classes at MMFS.   Among other things, the MMFS Report indicated that the Student was actively engaged in class and requested assistance from teachers when needed.

In addition, Feingold provided the CSE with the Student's academic levels and described her academic and social/emotional functioning strengths and weaknesses.   According to Feingold, the Student was functioning at a mid-sixth grade level in decoding and spelling, a high-fifth grade level in reading comprehension and writing, a mid-fifth grade level in computation, and a fourth grade level in problem solving. Feingold informed the team that the Student was having a great year socially, and that she was respectful and compliant with school rules.

The IEP reflects this information and contains an assessment of the Student's levels of academic performance and learning characteristics.   A narrative assessment of the Student's performance reflects that her reading skills were

progressing, literal comprehension skills were strong, and math skills were improving.  The narrative assessment also reflected that the Student struggled with problem-solving, that she sometimes rushed through computations, leading to careless errors, and that she was resistant to editing her work.  The IEP also contains a tabular assessment of the Student's instructional grade-level in the areas of decoding, reading comprehension, writing, computation, problem solving, and spelling.  The assessment reflects that the Student's instructional levels ranged from fourth grade to the middle of sixth grade.

The CSE determined that the Student would benefit from certain academic management strategies and tools: an FM unit;[4] graphic organizers; visual aids; review and repetition of learned skills; repetition and/or re-wording of directions; and teacher redirection.  The FM unit was recommended based upon the Student's auditory processing deficit with the intent of allowing her to screen out extraneous noise and improve her focus.  The IEP also recommended various additional services, including thrice weekly thirty-minute speech-language therapy sessions in a group of three, one weekly thirty-minute individual occupational therapy session, and one weekly thirty-

---

[4]    An FM unit allows a teacher's voice, captured by microphone, to be transmitted and amplified to a device, such as headphones, that the Student wears.

minute counseling session in a group of three.

The IEP also noted the Student's "social emotional performance."  It states that

> socially, [Student] is having a 'great year' according
> to her teacher.  One of her goals this year is to make
> some new friends, and she has been able to do so.
> [Student] is described as 'respectful' towards adults
> in school.  She is also compliant with school rules.
> [The Student's] parents report she is involved in
> extra-curricular activities such as sports, music
> lessons and dance.

Finally, the IEP lists a series of annual goals in various areas.  These are decoding, reading comprehension, writing, computation, math word problems, auditory processing, pragmatic language skills, graphomotor skills and counseling.

A copy of the IEP was not provided to the Parents at the CSE meeting.  Parise testified, and there is no testimony to the contrary, that although the IEP was drafted by hand at the meeting based on the goals discussed at that time, Parise typed up the formal, finalized pages of the IEP containing the goals after the meeting.  A copy of the IEP was mailed to the Parents on April 16, 2009.  The IEP did not, itself, contain a recommendation for a specific school for the Student.  Upon receiving the IEP, the Parents, who had counsel they had previously retained in connection with the Student's IEPs in previous years, "pass[ed] [the IEP] on to [their] attorneys." The 2009-2010 school year started on September 9, 2009.

III. The Placement Classroom

A Final Notice of Recommendation ("FNR"), dated August 13, 2009, was mailed to the plaintiffs offering a placement for the Student in a 12:1:1 class at M.S. 002 (the "Placement Classroom"). The plaintiffs were on vacation during the month of August, so did not receive the FNR until their return in September.  Counsel for the plaintiffs sent a letter dated August 24, 2009 to Deborah Jackson, Chairperson of CSE Region 8. The letter indicated that the Parents had decided to unilaterally place the Student at MMFS for the 2009-2010 school year.  The letter stated that "as of the date that this notice is being filed the parent has not been offered a specific placement."  The letter also indicated the Parents' intent to seek tuition reimbursement from the DOE.

The Placement Classroom was an eighth-grade class at M.S. 002 taught by Adewale Ogungbemi ("Ogungbemi"), designated a 12:1:1 classroom.  The Placement Classroom had ten students; eight of the students were classified as learning disabled, one as other health impaired, and one as emotionally disturbed. Ogungbemi has a master's degree in special education and is a certified special education teacher.  Ogungbemi had been teaching at M.S. 002 for four years at the time of the hearing; prior to arriving at M.S. 002, he taught at M.S. 246.  The classroom paraprofessional has a master's degree in economics

11

and had worked at M.S. 002 for five years.  An additional "health paraprofessional" with a bachelor's degree in education and eleven years of experience was assigned to a particular student.  But this health paraprofessional also works occasionally with the other students in the class, providing academic or social assistance.

The reading, writing, and listening comprehension levels of the students in the Placement Classroom ranged from third grade to seventh grade.  For reading, three students were at a seventh-grade level, two were at a third-grade level, and the other students ranged from a fourth to a sixth-grade level.  For math, four students were at a seventh-grade level, two were at a third-grade level, and the others students ranged from a fourth to a sixth-grade level.

The Placement Classroom uses a multisensory program for decoding and the Teacher's College model for reading and writing.  The school has a math coach who works closely with the teachers to provide differentiation strategies.  Burnett testified that the adults of the Placement Classroom differentiate instruction by content, product, and process, assess students' interest and ability, and develop activities and assignments that assist each student to move as close to grade level as possible.  Burnett, the special education teachers at M.S. 002, the math coach, and the assistant

principal have a common planning period each Monday to review the students' work, share strategies, and discuss how to move the students closer to grade level.

M.S. 002 has one full-time and one part-time speech provider.  There is a speech room, and speech therapy is provided on a push-in and pull-out basis.  The school has an occupational therapist four days per week, and a full-time counselor who sees all mandated and at-risk students.  The school would have been able to provide all of the mandated related services on the Student's IEP.

The Parents did not contact M.S. 002 until November 2009 and S.F. visited the school in early December.  During the visit, Arlene Burnett ("Burnett"), the special needs coordinator for M.S. 002, took S.F. on a tour of the school and past the Placement Classroom.  S.F. asked to sit in on the Placement Classroom while it was in session, but the principal, Ms. Spencer, told Burnett that the school would not be able to accommodate a sit-in visit.

IV.  The Student's Placement at MMFS for the 2009-2010 School Year

On February 6, 2009, before the CSE meeting, the Parents signed a contract with MMFS to enroll the Student at that school for the 2009-2010 school year (the "MMFS Contract").  The Parents did not mention the MMFS Contract to anyone at the CSE

meeting.

The tuition at MMFS for that year was $41,000.  The MMFS
Contract required the Parents to pay a non-refundable deposit to
MMFS in the amount of $6,500 on or before February 6, 2009.  The
MMFS Contract also required the Parents to pay 60 percent of the
full tuition amount -- $20,760 -- by July 1, 2009, but they paid
this amount on September 3, 2009.  The Parents paid an
additional $8,000 on January 5, 2010.  The MMFS Contract
included a program, in which the Parents enrolled, which
permitted them to pay an extra $1,075 for tuition refund
insurance.  Y.D. testified that the entire tuition amount for
the 2009-2010 school year was eventually paid.

V.   Proceedings Before the IHO

On January 7, 2010, the plaintiffs requested a hearing to
address the alleged failure of the DOE to provide the Student a
FAPE and to determine their eligibility for tuition
reimbursement.  The IHO held a hearing that spanned four dates -
- April 13, May 18, June 10 and July 1, 2010 (the "Impartial
Hearing").

At the Impartial Hearing, Parise and Burnett testified on
behalf of the DOE.  Burnett testified that the behavioral issues
present in the Placement Classroom include calling out of turn,
getting up without asking, and walking out of the room without
permission, but that the additional adult supervision addresses

14

these behaviors.  Burnett opined that these behaviors would not
interfere with the Student receiving an appropriate education.
Burnett's review of Feingold's description of the Student's
level of social-emotional functioning and the Student's IEP
indicated to her that the Student would get along well with her
peers in the Placement Classroom and that a lot of them are
socially "on par" with the Student.  Burnett also testified that
M.S. 002 could provide the Student with the services recommended
by the IEP, including an FM unit, and that the Student's IEP is
similar to the IEPs of other students at M.S. 002.

The Parents asked teachers at MMFS to speak at the
Impartial Hearing.  James Signorelli ("Signorelli"), the
Student's head teacher at MMFS for the 2009-2010 school year,
testified that the Student was very diligent and motivated, but
that she struggles with executive functioning, auditory
processing, written expression, language processing, and
distractibility.  Therefore, he believed that she "succeeds best
in a small . . . structured setting" that presents information
to her in ways that work best for her learning style -- with
visual reinforcement and step-by-step help from teachers.
Courtney Jimenez ("Jimenez"), the co-director of the middle
school program at MMFS, testified that the Student was "very,
very hard on herself."  Jimenez also testified that the Student
required a teacher to check in with her at least once during

15

every class to ensure she is comfortable with the material.
Signorelli testified that the Student's problems with self-
esteem mean that she may not ask for help on her own, and
requires teacher encouragement and attention to be sure she is
learning material.

The Parents also testified at the Impartial Hearing.  Y.D.
stated that the Student gets "tuned out and it could be sound,
it could be if another student were to get up and walk out of
the room for no reason."  The Parents were therefore concerned
about M.S. 002, which S.F. thought was "too many kids, too many
grades, too noisy."  S.F. believed that M.S. 002 was
inappropriate for the Student.

VI.  The IHO's Decision

The IHO issued his Findings of Fact and Decision (IHO
Decision") on August 16, 2010.  The IHO held that the DOE had
not offered the Student a FAPE because the DOE's placement offer
in the FNR was not timely, as it prevented the Parents from
visiting and evaluating the Placement Classroom before the start
of the school year.  The IHO also opined that once on site, S.F.
was not provided the ability to truly get a sense for the
appropriateness of the Placement Classroom for the Student.
Furthermore, the IHO found that a FAPE was not offered because
the District had not established why the Placement Classroom's
mix of students was appropriate for the Student's instructional

16

and social-emotional needs in light of the Student's
distractibility, need for close interaction with a teacher, and
non-disruptive academic environment.  The IHO also concluded
that the Parents' unilateral placement of the Student at MMFS
was appropriate and that the equitable considerations favored
the Parents.  Therefore, the IHO ordered the DOE to reimburse
the Parents the $41,100 cost of tuition for the Student's 2009-
2010 school year at MMFS.

VII. The SRO's Decision

     The DOE appealed the IHO Decision to the State Review
Office on September 20, 2010.  The SRO reviewed the Student's
IEP and the documentary and testimonial evidence introduced at
the Impartial Hearing, and in the SRO Decision dated October 25,
2010, reversed the holding of the IHO that the DOE had not
offered the Student a FAPE.  The SRO decided that the IHO had
erred as a matter of law in determining that the DOE's August
13, 2009 FNR was not timely because the placement was in effect
prior to the start of the 2009-2010 school year and because
there was no evidence in the record to suggest that the timing
of the notice had significantly impeded the Parents' meaningful
participation in the CSE process.  The SRO also decided that the
IHO had further erred as a matter of law in finding that the DOE
had an obligation to provide the Parents with an opportunity to
visit the Placement Classroom prior to the start of the school

17

year.  Accordingly, the Parents were afforded meaningful participation in the CSE process and the Student's right to a FAPE had not been impeded.

Turning to the substantive challenges discussed in the IHO Decision, the SRO determined that the DOE had offered the Student a FAPE because the Student's IEP addressed the Student's academic and social/emotional needs and because the Student would have been suitably grouped for both instructional and social/emotional purposes in the Placement Classroom.  The SRO found that the Student's academic levels fell in the middle of the range of those of the students in the Placement Classroom. He determined that the Placement Classroom would meet the student's academic management needs and would provide her with the recommended services in her IEP.  Furthermore, the SRO found that the Student's social/emotional needs would be met because the Student was socially on par with the other students in the Placement Classroom and because the Student's distractibility and need for close teacher-pupil interaction would have been appropriately addressed.

As the SRO had found that the DOE had provided the Student a FAPE for the 2009-2010 school year, the SRO did not continue his analysis and consider the appropriateness of the Parents' unilateral placement of the Student at MMFS or the equitable considerations.  The SRO therefore denied the plaintiffs'

18

request for tuition reimbursement.   The plaintiffs appealed the SRO Decision to this Court.


DISCUSSION

I.   Standard of Review

     Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment."  Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact."  Id.  Rather, the court conducts an "independent" review of the administrative record, basing its decision on the "preponderance of the evidence."  Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 205 (1982) (citation omitted).  Summary judgment thereby "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA."  Lillbask, 397 F.3d at 83 n.3 (citation omitted).

     Nevertheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," T.Y., 584 F.3d at 417 (citation omitted), and "courts may not 'substitute their own notions of sound educational policy for

19

those of the school authorities which they review.'"   Id.
(quoting Rowley, 458 U.S. at 206).   "While the district court
must base its decision on the preponderance of the evidence, it
must give due weight to the administrative proceedings, mindful
that the judiciary generally lacks the specialized knowledge and
experience necessary to resolve persistent and difficult
questions of educational policy."   Id. (citation omitted).   "The
deference paid to administrative proceedings is particularly
warranted where . . . the district court's decision [is] based
solely on the administrative record."   A.C. & M.C. ex rel. M.C.
v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009).   The court
should "defer to the final decision of the state authorities,
even where the reviewing authority disagrees with the hearing
officer."   Id. (citation omitted).   Judicial deference to the
administrative proceedings "is particularly appropriate when . .
. the state hearing officers' review has been thorough and
careful."   Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119,
129 (2d Cir. 1998).   In cases where "the SRO's decision
conflicts with the earlier decision of the IHO, the IHO's
decision may be afforded diminished weight."   A.C., 553 F.3d at
171.

II.  The IEP Did Not Suffer From Procedural Defects that Denied
     the Student a FAPE.

     The first consideration in determining whether the Parents
are entitled to tuition reimbursement is to ask "whether the
state has complied with the procedures set forth in the IDEA"
and "whether the IEP developed through the Act's procedures is
reasonably calculated to enable the child to receive educational
benefits." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192
(2d Cir. 2005) (citation omitted).  This "initial procedural
inquiry in an IDEA case is no mere formality, as adequate
compliance with the procedures prescribed would in most cases
assure much if not all of what Congress wished in the way of
substantive content in an IEP." A.C., 553 F.3d at 172 (citation
omitted).  At the same time, "it does not follow that every
procedural error in the development of an IEP renders that IEP
legally inadequate under the IDEA." Grim v. Rhinebeck Cent.
Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  Rather, a
procedural violation will constitute a denial of a FAPE "only if
the procedural inadequacies (i) impeded the child's right to a
free appropriate public education; (ii) significantly impeded
the parents' opportunity to participate in the decisionmaking
process regarding the provision of a free appropriate public
education to the parents' child; or (iii) caused a deprivation
of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

A.    The CSE Included a Regular Education Teacher.

The first alleged procedural deficiency of the Student's
IEP is that the CSE did not include a regular education teacher,
in violation of § 1414(d)(1)(B) of the IDEA, which governs,
inter alia, the composition of the CSE.  Specifically,
§ 1414(d)(1)(B)(ii) requires that the CSE include "at least one
regular education teacher of such child (if the child is, or may
be, participating in the regular education environment)."
Section 1414(d)(3)(C) further provides that "[t]he regular
education teacher of the child, as a member of the IEP Team,
shall, to the extent appropriate, participate in the development
of the IEP of the child."

Neither the SRO nor the IHO addressed the Parents'
arguments that the IEP suffered from this procedural deficiency
in their decisions, although the SRO noted that the CSE did
include a regular education teacher.  Indeed, the record is
replete with objective evidence that a regular education teacher
participated in the development of the IEP.  Parise signed the
IEP as the "General Education Teacher."  Parise testified, and
there is no evidence to the contrary, that she is a licensed
general education teacher, and that she has taught general
education classes, albeit many years ago.

The Parents argue that Parise is not qualified to serve as
the regular education teacher because she was not aware of the

most current regular education teaching techniques.  This assertion is entirely lacking in foundation.  The Parents do not contest that she is licensed and has experience as a regular education teacher, and can point to no statute or other authority that would disqualify her from serving in that role. There is no basis for their claim that Parise has only limited knowledge of current regular education practices.  There is therefore nothing in the administrative record sufficient to overturn the SRO's determination that Parise served as a regular education teacher.

Furthermore, even if Parise was not qualified to serve as a regular education teacher, the IDEA only requires that one participate "if the child is, or may be, participating in the regular education environment."  20 U.S.C. § 1414(d)(1)(B)(ii). The Student had been attending classes at MMFS, which only enrolls students with learning disabilities, for five years preceding the CSE meeting.  Nothing in the MMFS Report would have led those organizing the CSE to believe that a regular education environment would be appropriate for the 2009-2010 school year.  Although the IEP does indicate that a CTT environment was discussed at the CSE meeting, such classes are co-taught by a special education teacher and are not mainstream. A regular education teacher would therefore be neither required under the statute nor be able to add anything to a discussion

about such a classroom other than what a special education teacher would be able to contribute.

Even if a CTT classroom could be categorized as a "regular education environment," thereby making the participation of a regular education teacher necessary under the IDEA, and even if Parise were not a qualified regular education teacher, the absence of such a teacher did not deny the Student a FAPE. There was no educational benefit to the Student in the addition of such a teacher, as a regular education environment, even a CTT, was not ultimately recommended for the Student and there is no evidence that such an option was favored by the Student's teacher, the Parents, or any other CSE participant.

B.   The Lack of Formal Testing Reviewed by the CSE

The Parents next allege that the CSE did not consider any formal testing in the development of the IEP.  This alleged deficiency was also not addressed by the IHO or the SRO.

In developing the IEP, a CSE is required to "review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers."  20 U.S.C. 1414(c)(1)(A). "[O]n the basis of that review," a CSE would then "identify what additional data, if any may be necessary to determine," among

24

other things, "the present levels of academic achievement" of a
student.  20 U.S.C. § 1414(c)(1)(B).  Any additional assessments
need only be conducted if found necessary to fill in gaps in the
initial review of existing evaluation data.  20 U.S.C.
§ 1414(c)(2).  In the case of the Student, the CSE reviewed the
evaluations and observations provided by the Parents and MMFS,
including Feingold's testimony and the very detailed MMFS
Report.  There is no evidence in the record that any CSE
participant believed that this information needed to be
supplemented by additional evaluations such as formal testing of
the Student.  Indeed, not even the Parents testified that they
believed that the information they and MMFS supplied failed to
provide sufficient information for the CSE to determine the
Student's level of academic achievement.  The Parents provide no
support for their assertion that "[t]eacher estimates are not an
acceptable method of evaluation for determining a student's
academic functioning," citing only to a notice of interpretation
to a provision of the C.F.R. that states that school districts
may use a variety of assessment techniques, and lists, as
possible techniques, various kinds of evaluative tests.  34
C.F.R. Part 300, Appendix A, Notice of Interpretation, Question
1.[5]

---

[5]     In their reply brief in support of their motion for summary
judgment, the Parents raise a new argument about the data

C.   The IEP's Statement of Goals

The Parents also allege that because the IEP's statement of goals was typed following the conclusion of the CSE meeting, they were developed without the input of the Parents or the Student's teachers, depriving the Parents of their ability to participate in the development of the IEP.  Neither the SRO nor the IHO made any findings about the effect the method of drafting the IFP's statement of goals had on the Parents' ability to participate in their drafting.[6]

The IDEA provides that an IEP must have

> A statement of measurable annual goals, including academic and functional goals designed to --
> (A)   Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

---

reviewed by the CSE, contending that Parise admitted to omitting considerable information from the MMFS Report from the IEP. This argument mischaracterizes Parise's testimony, as a quick review of the hearing transcript reveals.  Parise's testimony is that she did not include two specific opinions -- not actual data, and certainly not considerable information -- that Feingold contributed orally at the CSE meeting.  Nevertheless, even if Parise had omitted such information, the Parents have not identified any requirement that the IEP include all data or information supplied to the CSE.  The Parents do not explain why the omission of this particular information is a procedural or substantive deficiency of the IEP.

[6]   The Parents argue that the IHO did consider this issue, but the only mention in the IHO Decision was in the IHO's presentation of the DOE's case, not in the IHO's own findings of fact and conclusions of law.  In any case, the IHO's statement of the DOE's characterization of this issue does not diverge from this Opinion.

> (B) Meet each of the child's other educational
>     needs that result from the child's disability.

20 U.S.C § 1414(d)(1)(A)(i)(II).  It also requires that the
Parents be provided an opportunity to "participate in meetings
with respect to the identification, evaluation, and educational
placement of the child, and the provision of a free appropriate
public education to such child."  20 U.S.C. § 1415(b)(1).  The
regulations implementing these requirements provide that "[e]ach
public agency shall take steps to ensure that one or both of the
parents of a child with a disability are present at each IEP
meeting or are afforded the opportunity to participate."  34
C.F.R. § 300.322(a).  Furthermore, "[t]he public agency shall
give the parent a copy of the child's IEP at no cost to the
parent."  34 C.F.R. § 300.322(f).

There is no dispute that these requirements were met.  The
Parents attended and participated in the CSE meeting, where
goals for the Student's education in the 2009-2010 school year
were discussed.  Parise testified that the CSE members drafted
the goals during the meeting after speaking with Feingold, and
that all CSE members had an opportunity to participate in that
process.  The IEP was then provided to the Parents when it was
mailed to them on April 16, 2009, and includes a statement of
annual goals that address the Student's educational needs.

The Parents contend that the CSE "failed to develop any goals for [the Student] at the meeting, but drafted them afterwards."  But Parise's testimony, to which they cite to support this assertion, reveals that the only thing that happened after the CSE meeting was the typing of the goals onto the final IEP form.  The goals were discussed and drafted -- albeit by hand -- at the CSE meeting.  Y.D.'s testimony that the Parents did not see the goals on paper until the IEP was mailed to them does not contradict Parise's testimony.  The Parents have not identified any requirement in the IDEA or case law that the IEP's statement of goals be typed up at the CSE meeting itself, or that parents or teachers have the opportunity to actually draft the goals by hand or on the computer themselves, or that the goals be seen on paper by any of the CSE members at the meeting.  See J.G. v. Briarcliff Manor Union Free School Dist., 682 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) ("there is no legal authority requiring parental presence during the actual drafting of the written IEP document").  Indeed, the Second Circuit has found that even when a draft document is shown to a parent at the end of a CSE meeting, this draft does not serve to fulfill either the requirement that the parent be given the opportunity to participate in a discussion of goals at the CSE meeting or the requirement that the Parent be provided with an IEP finalized after the meeting.  Cerra, 427 F.3d at 193.

28

D.   The Timely Placement Offer

The Parents also allege that the delay in receiving the FNR designating the Placement Classroom -- which was sent to them on August 13, 2009, but which they did not actually receive until September, when they returned from vacation -- denied them the ability to participate in the process of determining the appropriate educational placement for the Student. Specifically, they argue that the delay prevented them from visiting the Placement Classroom before the start of the school year so that they could determine if it were an appropriate setting for the Student.

The IHO and SRO both directly considered this argument. The IHO found that because the FNR was not issued until August, and the class was not in session during that month, the Parents had no opportunity to visit it and determine its appropriateness.  This made the FNR untimely.  The SRO found that the IHO's findings were in error because the FNR was timely provided prior to the start of the 2009-2010 school year, pursuant to relevant regulations.  Furthermore, although the IHO did not explicitly state whether or not he believed the alleged delay impeded the Student's right to a FAPE, significantly impeded the Parents' opportunity to participate in the process or caused a deprivation of educational benefits, the SRO noted that such a finding would have also been in error, as there is

29

no obligation placed on the DOE by statute or case law to provide the Parents an opportunity to visit a recommended placement classroom.

The SRO's careful assessment of both the record and the controlling case law is entitled to deference. Walczak, 142 F.3d at 129. The DOE sent the FNR on August 13, nearly four weeks prior to the start of the school year, providing the Parents the opportunity to speak with a District Representative, request another CSE meeting about the Placement Classroom, or to visit M.S. 002. Although one of the Parents' objections is that the delay prevented them from visiting the Placement Classroom while it was in session, they do not explain how any earlier FNR would have made it any more possible for them to do so. The Placement Classroom was not in session until September 2009; even if the FNR had been sent much earlier in the year, before the 2008-2009 school year ended, the particular Placement Classroom with the particular combination of teachers and students that was recommended in the FNR for the Student might not have existed.[7] The earliest, therefore, that the Parents could have seen the Placement Classroom was September 9, the

---

[7]    Notably, the Parents' argument, if accepted, would place an unreasonable burden on the DOE to ensure that any proposed placement classroom recommended as a result of an IEP be already constituted, and therefore available for a visit from parents, in the school year prior to the one in which a student would enroll.

first day of the 2009-2010 school year, and four weeks after the
FNR was mailed to them.

The SRO also correctly found that even if the FNR were
untimely, it did not interfere with the provision of a FAPE or
the Parents' opportunity to participate because the Parents have
no right to visit a proposed school or classroom before the
recommendation is finalized or prior to the school year.  The
IDEA requires that the DOE have an IEP "in effect" at the
beginning of the school year.  20 U.S.C. § 1415(d)(2)(A).  The
IEP, itself, does not need to specify a specific school site.
T.Y., 584 F.3d at 420.  The courts in this District have found
that "an education department's delay [in sending an FNR] does
not violate the IDEA so long as the department still has time to
find an appropriate placement for the beginning of the school
year in September."  M.P.G. ex rel. J.P. v. New York City Dept.
of Educ., No. 08 Civ. 8051 (TPG), 2010 WL 3398256, at *9
(S.D.N.Y. Aug. 27, 2010) (citing similar findings in additional
cases).  Indeed, there is no procedural deficiency even if the
IEP, which generally precedes the FNR, is provided to the
parents only shortly before the start of the school year.
Cerra, 427 F.3d at 193-94.

Furthermore, the right of parents to participate in the
meetings concerning their child's educational placement does not
include the right to pick a particular classroom or school.

31

"[T]he term 'educational placement' in the regulations refers only to the general type of educational program in which the child is placed." T.Y., 584 F.3d at 419 (citation omitted). That is to say, "the general educational program -- such as the classes, individualized attention and additional services a child will receive -- rather than the bricks and mortar of the specific school." Id. A school district is also not obligated to comply with an arguably less burdensome request -- providing the profiles of the students in a proposed classroom. Cerra, 427 F.3d at 194. The parents may have input into the choice of a school, but no veto. T.Y., 584 F.3d at 420.

While the Parents may have been dissatisfied by the DOE's slow pace, the Parents' participation in the CSE meeting, and the timely delivery of the FNR, provided them the opportunity to have input into both the educational placement and the actual location recommended by the DOE. See Cerra, 427 F.3d at 194. Although, as they have done here, the Parents may challenge whether the DOE denied the Student a FAPE as a substantive matter if the Placement Classroom cannot deliver the services determined in the IEP, their inability to visit the classroom to form an opinion as to its appropriateness is not itself a procedural defect.

III. The IEP Was Not Substantively Inadequate Under the IDEA.

"The purpose of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Walczak, 142 F.3d at 130 (citation omitted). Therefore, the IDEA does not require that an IEP furnish "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P., 554 F.3d at 254 (citation omitted); see also Cerra, 427 F.3d at 195. A school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Walczak, 142 F.3d at 122.

"[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." T.Y., 584 F.3d at 418 (citation omitted). "[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not

impermissibly meddle in state educational methodology, it must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan."  Gagliardo, 489 F.3d at 113 (citation omitted). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim, 346 F.3d at 382.

A.   The IEP Itself Was Substantively Sufficient.

The IEP itself -- the plan developed at the CSE meeting and mailed to the Parents on April 16, 2009 -- satisfies all the requirements under the IDEA and the law of this Circuit. Neither the IHO nor the SRO discussed the substantive appropriateness of the IEP itself, as distinguished from the Placement Classroom.  But it is clear from an independent review of the record that the IEP includes all the required components under the IDEA, 20 U.S.C. § 1414(d)(1)(A), and that it was based on and incorporated the detailed evaluations, observations and other information provided by the Parents and MMFS.  The plaintiffs point to no objective evidence that the IEP was not tailored to allow the Student to achieve non-trivial advancement in the 2009-2010 school year.

Rather, the plaintiffs argue that the IEP is not reasonably calculated to enable the Student to receive educational benefits

34

because the location of the Placement Classroom was not known at the CSE meeting.  As noted above, the IEP need not name a specific school location.  T.Y., 584 F.3d at 419-20.  The "educational placement" which the CSE must consider is only the "general type of educational program," not the specific school. Id.  There is therefore no requirement that the CSE members be aware of the particular school location during their meeting. The plaintiffs' objections to the Placement Classroom do not allege a possible failure of the IEP, but rather a possible failure of the Placement Classroom to satisfy the requirements of the IEP -- a challenge addressed below.

The plaintiffs' briefs also state that the IEP "departed from Ms. Feingold's report with no independent basis for doing so," without explaining the nature of this alleged departure. Assuming that this is a reference to the IEP's recommendation that the Student be placed in a 12:1:1 classroom, and not in smaller groups for reading and math, as Feingold opined would be ideal at the CSE meeting, there is no basis for this objection. The Parents testified that they supported the 12:1:1 classroom recommendation at the CSE meeting, and in their briefs continue to do so.  Therefore, it is disingenuous to vaguely refer to this divergence as a substantive deficiency of the IEP.

B.   The Placement Classroom Selected By the DOE Provided
     the Student a FAPE.

The plaintiffs' chief argument concerning the alleged
denial of a FAPE to the Student is that the Placement Classroom
selected by the DOE is not appropriate to meet the Student's
educational needs.   Their concern is that the students in the
Placement Classroom would be an inappropriate peer group for the
Student, as it was composed of eight students with learning-
disabilities, one student classified as "emotionally disturbed"
and one student classified as being "other health impaired."[8]

1.   The SRO Decision Is Entitled to Deference.

The IHO and SRO both considered this argument.   The IHO
found that the Parents had shown that the Student was highly
distractible, and that they had reason to be concerned that a
classroom that included learning disabled children and "some
emotionally-disturbed children" may not meet the Student's
educational needs -- namely, "very close teacher-pupil
interaction on a step by step basis, and . . . a very quiet,
non-disruptive environment."   The IHO did not carefully review
the testimony of the DOE witnesses.   Rather, the IHO noted that

---

[8]   In the proceedings before the IHO and the SRO, the Parents
also asserted other alleged deficiencies with the Placement
Classroom, including its setting in M.S. 002, which shares a
building with another school.   The Parents do not raise these
arguments in their briefs before this Court, and so have not
shown why the SRO's determination to dismiss these arguments is
unworthy of deference.

the DOE witnesses, Parise and Burnett, had not directly
addressed the mix of disabilities of the students in the
Placement Classroom, but instead testified that the norm was for
learning-disabled children to be placed with children with
similar academic management teams.  He therefore concluded that
they "confirm[], by omission, that the parents' fears about M.S.
002 were correct."

     The SRO carefully considered the full evidentiary record in
finding that the IHO erred on this issue.[9]  The SRO found that
the testimony of Burnett provided sufficient evidence to
determine that the Placement Classroom complied with state
regulations concerning the composition of special education
classrooms.  The academic needs of the Student were very similar
to those of the other students in the class.  In fact, her
academic functioning fell in the middle of the range for the
students in the Placement Classroom.  Burnett also testified
about the differentiation strategies used to personalize
instruction in the Placement Classroom for each student.
Furthermore, her testimony revealed the way in which the adults
in the classroom -- Ogungbemi, the classroom paraprofessional,
and the additional health paraprofessional -- shared the

---

[9]     Whereas the IHO's discussion on this topic did not delve
deeply into the evidence, and spanned less than three-quarters
of one double-space typed page, the SRO's analysis spanned
nearly three single-space typed pages.

responsibilities of classroom instruction and social/emotional
support, including providing one-on-one assistance and handling
any "acting out" that might occur.  Burnett testified that the
Placement Classroom and M.S. 002 would be able to provide the
Student with all of the specialized services identified in the
IEP, including an FM unit, which would help the Student focus.
The record also contained evidence that the concerns of the
Parents about the general school setting -- connected, as it
was, to another school -- would not impact the Student's ability
to focus in class.

There is no reason to reconsider the SRO's careful
determination on this issue, which was based on extensive
testimony in the record as to the Placement Classroom's ability
to address the Student's needs and provide her with a FAPE
taking into consideration the particular mix of students.
Indeed, the "functional group" proposed for a student is a
matter of educational policy concerning which this Court should
pay particular deference to the SRO.  M.P.G., 2010 WL 3398256,
at *11.

The Parents contest the deference that should be accorded
to the SRO, arguing, first, that his disagreement with the IHO
is rooted in throwing out the IHO's finding that the Parents
were "credible" and that Burnett and Parise were "evasive."
There is no basis in the record for this contention.  The IHO

never found that the DOE witnesses were "evasive," only that
because they failed to testify on a certain subject (as he saw
it), they admitted by omission the validity of the Parent's
concerns.  Furthermore, the SRO made no determinations about
credibility -- if he had, the SRO Decision would have stated
that he found that the Parents were not truthful about their
concerns about the Placement Classroom and its students.  But
the SRO Decision does no such thing.  Instead, it (i) recognizes
the concerns of the Parents; (ii) notes the facts about the
Placement Classroom which should allay those concerns; and (iii)
finds that in the face of these facts, the Parents' concerns
were not legally sufficient to find that the DOE had denied the
Student a FAPE.  This is not a credibility determination because
the SRO made no judgment as to the veracity of the Parents'
purported beliefs about what is right for the Student.  The
conflict here is not which side is truthful.  Rather, it is a
disagreement about educational policy and the legal obligations
of the DOE under the IDEA, an area in which the SRO is accorded
deference.

     The Parents next contend that the SRO's determination on
this issue should not be accorded deference because it relies
solely on the testimony of Burnett, and that this testimony is
baseless as she does not know the Student, but instead referred
to the IEP to understand the Student's needs.  But Burnett did

not testify as to what the Student's academic and
social/emotional levels or needs were; her testimony was about
M.S. 002 and the Placement Classroom, how they function and what
they can offer the Student.  Burnett relied upon the IEP to
determine what it recommended for the Student, and testified
from her personal knowledge about the services and environment
that the Placement Classroom and M.S. 002 could provide to
fulfill the IEP.  Her testimony was grounded both in her
knowledge of the setting recommended for the Student and her
experience with children like the Student.[10]

> 2.   The Peer Group in the Placement Classroom
>      Complied With New York State Regulations.

The Parents argue that the composition of the Placement
Classroom violates New York State regulations implementing the
IDEA.  These regulations require that the "chronological age
range within special classes of students with disabilities who
are less than 16 years of age shall not exceed 36 months" and
that students be suitably grouped for instructional purposes
with other students having similar individual needs. 8
N.Y.C.R.R. §§ 200.1(ww)(3)(ii), 200.6(a)(3), 200.6(h)(2),

---

[10]   The Parents take issue with Burnett's testimony that the
Student "would definitely get along with her peers" because she
had never met the Student.  In context, it is clear that this
statement means that from Burnett's reading of the evaluations
of the Student reflected in the IEP, the Student would fit in
well with the other students of the Placement Classroom.  The
DOE does not argue that Burnett has personal knowledge of the
Student's personality other than what is in the IEP.

200.6(h)(5).  The school district should look to the prospective

group's range of academic achievement, learning characteristics,

social development, physical development and management needs in

order to assess if the grouping is suitable.  "The range of

academic or educational achievement of such students shall be

limited to assure that instruction provides each student

appropriate opportunities to achieve his or her annual goals."

8 N.Y.C.R.R. § 200.6(a)(3)(i).  But,

> [t]he management needs of such students may vary,
> provided that environmental modifications,
> adaptations, or, human or material resources required
> to meet the needs of any one student in the group are
> provided and do not consistently detract from the
> opportunities of other students in the group to
> benefit from instruction.

8 N.Y.C.R.R. § 200.6(a)(3)(iv).

The SRO found that the Student's academic functioning

levels, between fourth to mid-sixth grade, were in the middle of

the functioning range of the Placement Classroom students, which

ranged from third to seventh grade.  The record also indicates

that although the management needs of the students in the

Placement Classroom may vary, there is no evidence that this

would detract from the Student's educational opportunities,

especially considering the number of adults in the Placement

Classroom and their experience providing supervision and

guidance to students with special needs.

The Parents conflate two of the regulatory requirements ––

the age limit and the similarity of individual needs -- in challenging this range of academic levels in the Placement Classroom.  The "maximum three-year range" that the Parents reference in their brief is a maximum chronological age range. 8 N.Y.C.R.R. § 200.6(h)(5).  There is no "maximum" range for levels of academic achievement, only a requirement that this range be limited.  8 N.Y.C.R.R. § 200.6(a)(3)(i).  And there is no "maximum" range for other types of development and management needs.  8 N.Y.C.R.R. § 200.6(a)(3)(ii)-(iv).  Therefore, the Parents have no basis for their argument that the District did not provide an appropriate peer group pursuant to the New York regulations.[11]

> 3.   The Mix of Students in the Placement Classroom
>      Would Not Deny the Student a FAPE.

The plaintiffs' argument about the Placement Classroom's mix of students is not restricted to an argument about New York State regulations.  They also contend that the composition of the Placement Classroom would substantively interfere with the Student's educational opportunities, particularly because of her distractibility, and, therefore, the recommendation of the

---

[11]   Even if they had demonstrated a violation of New York regulations, this would not automatically constitute a violation of the DOE's obligations under the IDEA.  See A.C., 553 F.3d at 172 ("Assuming such a violation [of a New York regulation] may have occurred, the violation of such a regulation does not compel the conclusion that the . . . IEP was legally inadequate.").

Placement Classroom did not provide the Student with a FAPE.

A proposed classroom composed of students with differing "intellectual, social, and behavioral needs" can still be adequate so long as "a core group was operating at an intellectual level sufficiently comparable to [the Student's] to permit her to continue making academic progress." Walczak, 142 F.3d at 133-34. Uniformity of needs is therefore not required. Id. The IDEA does not require school districts to provide the best possible placement, only an appropriate education which allows the child to receive a meaningful educational benefit. Rowley, 458 U.S. at 199; T.P., 554 F.3d at 254.

Here, the Placement Classroom specifically addressed the Student's distractibility. She would have been provided with an FM unit which would help her screen out extraneous noise and improve her focus. The Placement Classroom had a small number of students and several qualified adults. The teachers used differentiation strategies, a multisensory reading program, and instruction in small groups. With regard to behavioral issues, Burnett did testify that "children will act out," but this statement, read in context, does not indicate that the students in the Placement Classroom are more prone to acting out than any other group of students. Burnett testified that "the teacher . . . has control over that room" and that the additional adult supervision allows any acting out to be properly managed. This

record amply shows that the IEP, as implemented in the Placement Classroom was reasonably calculated to provide the Student a FAPE despite her distractibility.

The IHO's brisk finding that the DOE admitted "by omission" that the Placement Classroom's student group could not be appropriate for the Student contrasts with the SRO's carefully supported conclusion that the DOE witnesses provided sufficient information about why the Placement Classroom and its students would constitute an appropriate educational environment for the Student.  This disagreement is rooted in the focus of the IHO, and indeed the Parents, on the fact that one of the students in the Placement Classroom is emotionally disturbed and one is "other health impaired."  It is true that the DOE witnesses, and the SRO, do not directly address the effect of having students not categorized as "learning disabled" in the Placement Classroom.  But given the testimony that the entire student group, including those not labeled "learning disabled," fell within an academic range in which the Student would fit well, and that the social/emotional dynamic of the group would not detract, but actually benefit, the Student, the Parents can point to no reason why the fact that the Placement Classroom is not purely composed of children with learning disabilities has any bearing in this analysis.  The plaintiffs' argument about students in the proposed peer group "acting out" is based on

44

testimony by Burnett that does not indicate that the behavioral problems in the Placement Classroom are any worse than in other classrooms.  Furthermore, the record shows that any such issues can be adequately managed by the adult supervision in the Placement Classroom.  The contention that the Student's own emotional needs "are not those warranting placement in a classroom with students with behavioral needs" represents a disagreement about educational policy that, in any case, mischaracterizes the evidence.

It may be that the Parents would prefer that the Student not be placed in a classroom in which there is a student categorized as "emotionally disturbed," but this preference is not sufficient to show that the DOE has denied the Student a FAPE.  It is also not sufficient for the Parents to argue that a setting that had only students with learning disabilities would be superior to the Placement Classroom.  The IDEA does not require school districts to provide the best possible placement, only an appropriate education which allows the child to receive a meaningful educational benefit.  Rowley, 458 U.S. at 199; T.P., 554 F.3d at 254.  The relevant inquiry is therefore not whether the Placement Classroom provided all possible support to ensure that the Student did not lose focus, but rather whether objective evidence indicated that she was likely to progress, not regress, under the proposed plan.  See Cerra, 427 F.3d at

196; see also Rowley, 458 U.S. at 206 (holding that court may
not impose demands on school district greater than those
required by the IDEA).  Such feelings may compel a parent --
perhaps with good reason -- to choose to send their child to a
private school in which the parent has more say over their
child's peers, but these feelings are not evidence that a school
district failed to provide the child a FAPE.


CONCLUSION

      This Opinion upholds the SRO Decision, which found that the
DOE had provided the Student a FAPE.  Therefore, this Opinion
"need not reach the issues whether the additional services
provided by the parents were appropriate, or whether equitable
considerations affect relief."  T.P., 554 F.3d at 254.

      The DOE's July 1, 2011 motion for summary judgment is
granted and the plaintiffs' May 31 motion for summary judgment
is denied.  The Clerk of Court shall enter judgment for the
defendant and close the case.


Dated:    New York, New York
          November 9, 2011

                              _____
                                      DENISE COTE
                              United States District Judge